# United States District Court

for the
District of Massachusetts

| | | |
|---|---|---|
| Jeremy Southgate, *pro se*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 1:2014-cv-13861 |
| | ) | Hon. Judge Nathaniel Gorton |
| Lyor Cohen, | ) | |
| Warner Music Group Corp., | ) | |
| 300 Entertainment Music Publishing LLC, | ) | |
| Access Industries, Inc., | ) | |
| Access Industries, LLC, | ) | |
| Access Industries Holdings LLC, | ) | |
| Adam Pallin, | ) | |
| Ana Villanueva, | ) | |
| Andres Santo Domingo, | ) | |
| Alex Zubillaga, | ) | |
| Aryeh Bourkoff, | ) | |
| Atlantic Recording Corporation, | ) | |
| Bain Capital, LLC, | ) | |
| Barry Diller, | ) | |
| Christopher Nolte, | ) | |
| Columbus Nova Advisors LLC, | ) | |
| Columbus Nova Asset Management LLC, | ) | |
| Columbus Nova Management LLC, | ) | |
| Columbus Nova Partners LLC, | ) | |
| Craig Kallman, | ) | |
| Edgar Bronfman Jr., | ) | |
| Google Inc., | ) | |
| Google LLC, | ) | |
| IAC/InterActiveCorp, | ) | |
| iHeartMedia, Inc., | ) | |
| Interactiv Corporation, | ) | |
| Julie Greenwald, | ) | |
| Kelly Rosenthal, | ) | |
| Kin Collective, Inc., | ) | |
| Kin Collective LLC, | ) | |
| Kevin Liles, | ) | |
| Len Blavatnik, | ) | |
| LionTree Advisors LLC, | ) | |
| LionTree Capital Partners LLC, | ) | |
| LionTree LLC, | ) | |

2014 DEC 4 PM 4 43
U.S. DISTRICT COURT
DISTRICT OF MASS.
FILED
IN CLERKS OFFICE

LionTree Media LLC,                               )
LionTree Partners, LLC,                           )
Massachusetts Institute of Technology,            )
Milk Studios, LLC,                                )
Mindspark Interactive Network, Inc.,              )
Neil Zamil,                                       )
Noam Gottesman,                                   )
Ori Winitzer,                                     )
Pete Giberga,                                     )
Plus One Records, LLC,                            )
Providence Equity Partners L.L.C.,                )
Quality Control Music LLC,                        )
Roger Gold,                                       )
SoundSpark Inc.,                                  )
Stanford University,                              )
Stephen Cooper,                                   )
Theory Entertainment LLC,                         )
Thomas H. Lee Partners, L.P.,                     )
Time Warner Inc.,                                 )
Todd Moscowitz,                                   )
Toms Capital Inc.,                                )
Toms Capital LLC,                                 )
Toms Capital Management LLC,                      )
Twitter Inc.,                                     )
Warner Bros. Entertainment Inc.,                  )
WMG Holdings Corp.,                               )
Zoe Silverman,                                    )
                                                  )
and others with identities unknown,               )
                                                  )
Defendants.                                       )

## SOUTHGATE V. COHEN, WMG, ET AL.

### JURISDICTION AND VENUE

1.    Jeremy Southgate is a citizen of Massachusetts.

2.    Ana Villanueva is a student of the Massachusetts Institute of Technology residing in Massachusetts; Christopher Nolte is a student of the Massachusetts Institute of Technology residing in Massachusetts; Lyor Cohen is a citizen of New York; SoundSpark Inc. is a Delaware corporation and a foreign corporation registered in Massachusetts; Theory Entertainment LLC is a Delaware limited liability company; Warner Bros. Entertainment Inc. is a Delaware corporation; Warner Music Group Corp. is a Delaware corporation.

3.     Jurisdiction and venue are proper pursuant to Title 15 U.S.C. §1121.

## COMPLAINT FOR FEDERAL TRADEMARK INFRINGEMENT

### INTRODUCTION

4.     My name is Jeremy Southgate, and I hereby affirm under penalty of perjury that the following is true to the best of my own knowledge and belief.

5.     I am the owner of United States Trademark Registration No. 4,606,004 for **SOUND SPARK STUDIOS**® (and design)[1], and I am both founder and president of Sound Spark Studios, doing business as a Massachusetts sole proprietorship and as a solely owned Delaware limited liability company.

6.     I believe that the defendants have committed to and are thereby engaging in *egregious* activities that constitute federal trademark infringement and unfair competitive practices.

### DEGREE OF PLAINTIFF'S INVESTMENT IN THE BRAND

7.     I am a musician who is trying to start a new music and entertainment company on a strong foundation.

8.     After voluntarily leaving school at age 20 and spending some lonely months (February-August 2011) producing over 22 hours of documented original music concepts, without internet and television and other activities common for pleasure, I have worked faithfully and diligently to make my own living and to pursue a better future.

9.     I was entry-level employed at a Starbucks for approximately two years (November 28, 2011-December 16, 2013), during which time, in the first year, I earned approximately $14,500 and, in the second year, $17,000, where I also worked a second job (working a total of six days per week) as a door-to-door fundraiser for WBGH for two cold months (January-February 2013)[2].

10.     As I developed my intellect, teaching myself music production techniques, computer programming languages, and business law, and I developed my music, with practically all music performance and production done on my own, I concurrently conducted heavy research in order to find a unique name in order to distinguish my music ("goods", trademark class 009)[3].

---

[1] EXHIBIT A

[2] EXHIBIT B

[3] EXHIBIT C

11.   As early as November 22, 2011, I had designed concepts for a distinct name (word mark) and logo (design mark) that became the "Sound Spark Studios" mark[4].

12.   On June 28, 2012, I filed an application for a federal trademark registration, and that application has since matured into U.S. Trademark Registration No. 4,606,004.

13.   As of October 2014, I, Jeremy Southgate, have invested a diligently estimated $47,955 and three years of dedication into forming and developing Sound Spark Studios. I believe, therefore, that it is *proper* for the *law* to *define* this novel intellectual concept, my trademark, and its evident applications, which I authored, as my inalienable *property*.

14.   I have invested my life and liberty to create this Good.

THEORY FOR FINDING PATTERN OF INFRINGEMENT

15.   It is possible and seems likely that Lyor Cohen was aware of my trademark while in his capacity as CEO of Warner Music Group ("WMG"), or as a result of this capacity and WMG's capacity for research and awareness of new trademark applications relating to entertainment.

16.   I believe that Lyor Cohen's *abrupt* departure as CEO of WMG, announced September 24, 2012[5], three months after I filed my trademark application, while the music industry was struggling, while maintaining to have full access to WMG's resources, is a very suspicious and unusual arrangement.

17.   Once aware of *the mark,* I believe, Lyor Cohen became aware of *my claim to ownership of the mark*; wherefore, Lyor Cohen seems to have presented bad faith to me via (a) the subtlety of an evidently subversive scheme by his other associates and agents (Theory Entertainment LLC, Warner Bros. Entertainment Inc., Warner Music Group Corp.) and (b) via the approach of two MIT graduate students (Ana Villanueva, Christopher Nolte), due to his guiding influence, as he has infringed upon my intellectual property rights.

18.   There appears to be no evidence supporting a claim that the MIT students had conducted due diligence surrounding what they reasonably believed was an original and valuable idea, because they were not aware of my name conflict, most obviously, nor were they fully aware of their would-be

---

[4] EXHIBIT D

[5] EXHIBIT E

competitors for such an idea (e.g. Earbits, Spotify, Pandora, Kickstarter, and Indiegogo).

## FURTHER HISTORY OF ACTIONS AND INTERACTIONS

19.   Having left WMG in the last quarter of 2012, throughout the Year 2013, Lyor Cohen and associates were connected with the registration of the entity Theory Entertainment LLC, in Delaware, which masks the identity of 300 Entertainment while doing business as for 300 Entertainment, and federal trademark applications for a word mark and then an abstract design mark.[6]

20.   The timed staggering of two by five trademark applications, I believe, is premeditated, because I do not believe that Lyor Cohen and associates would form a company with only a word mark, filed April 24, 2013, and moreover because the words only "300 Entertainment" might not trigger a likelihood of confusion with U.S. Trademark Registration No. 4,606,004, which was pending at that time.

21.   Now, however, with their suspicious and particular choice of abstract mark, filed September 30, 2013, although I have timely initiated opposition proceedings for the design mark, the window of time has passed to oppose the word mark with a standard opposition proceeding.

22.   Pete Giberga, now an associate of 300 Entertainment, had an opportunity to know of my inherently distinctive trademark as early as June 28, 2013, because I sent him an email[7], asking for his help and collaboration as an entertainment manager, in connection with the mark. He did not respond or acknowledge.

23.   Prior to the formation of 300 Entertainment, I believe, Pete Giberga must certainly have contributed to Lyor Cohen's awareness of my mark and its distinctiveness.

24.   The web domain name "threehundred.biz" was registered on October 21, 2013, with a website and social media pages launched therewith, and it appears to indicate first use of the mark(s), most notably the mark consisting of triangle that, I believe, was intentionally made to be an abstract shape, so as to be a subtle but colorable imitation of the arrangement of the words "SOUND", "SPARK", and "STUDIOS" in U.S. Trademark Registration No. 4,606,004[8].

---

[6] EXHIBIT F

[7] EXHIBIT G

[8] EXHIBIT H

25.    Around the time of October 23, 2013, it was announced publicly that Google had made an investment[9] of $5 million in 300 Entertainment. What's the big idea? (A byte's already been taken out of the Apple, and by any other name it would not be as sweet).

26.    On November 21, 2013, Lyor Cohen visited[10] the Massachusetts Institute of Technology ("MIT"), and I believe, he may have been looking for young students specifically for the purpose of approaching me via their agency.

27.    It may be true that two students, Ana Villanueva and Christopher Nolte, recognized his fame and approached Lyor Cohen with a good-faith idea for a 'Kickstarter or Indiegogo for music'; however, there appears to be no evidence for the origin of the students' use of "SOUNDSPARK", and I believe, Lyor Cohen may have provided the name to them in order to target a weakness in U.S. Trademark Registration No. 4,606,004: "SOUND" and "STUDIOS" are disclaimed from exclusive right; therefore, Lyor Cohen appears to have encouraged their infringement with the intent of diluting "SPARK".

28.    The web domain name "SoundSpark.me" was registered[11], by Christopher Nolte, on January 17, 2014. I had no means of being immediately aware of it.

29.    On April 16, 2014, in anticipation of further developing my brand and company, I mailed my Articles of Organization for Sound Spark Studios LLC to the Delaware Division of Corporations.

30.    On May 9, 2014, I noticed that Sound Spark Studios LLC had been accepted with the Delaware Secretary of State, and the entity was deemed filed[12] with the State as of April 21, 2014.

31.    On May 14, 2014, the school project startup run by Ana Villanueva and Christopher Nolte and titled "SoundSpark" 'won' $10,000, an instantly gratifying prize and publicity[13] gift from MIT. I had no means of being immediately aware of it.

---

[9] EXHIBIT I

[10] EXHIBIT J

[11] EXHIBIT K

[12] EXHIBIT L

[13] EXHIBIT M

32.    Beginning on August 6, 2014, I noticed, on a visitor log[14], many page visits (counted 79 as of October 2, 2014) to my website "soundsparkstudios.com" from IP Addresses that, when I searched a "whois" database, identified "Warner Bros. Entertainment Inc." as the domain registrant. Hence, I believe, I can deduce that Warner Bros. has made full use of my website, visited every page including the legal terms and conditions, and they have had reasonable notice of my intellectual property claims.

33.    On August 7, 2014, I received my first email[15] contact from and awareness of Ana Villanueva asking to "talk about the trademark" on a phone call. I believe, the defendants were trying to set me up so that they could claim inferences from our conversation that I would be unable to contradict with evidence since phone calls take place 'off the record'.

34.    On August 8, 2014, I filed a service mark application, having serial number 86360938, for my same mark (US TM Reg. No. 4,606,004) in relation to services. I was thereby following my natural progress and bona fide intent, since 2011, to build on this brand.

35.    I responded via email to Ana Villanueva's email[16] of August 7, 2014, with a bona fide intention to treat but also to bar any inferences from a phone conversation, and when she agreed, I joined a phone conference of approximately 15 to 20 minutes with Ana Villanueva and Christopher Nolte on August 11, 2014.

36.    On our phone call, Ana Villanueva and Christopher Nolte did not mention Lyor Cohen or 300 Entertainment by name. They simply said, they had met and been mentored by a music industry executive and had founded a music company startup, and they had been invited to New York to pitch their idea to an office. They said, they would be working on this startup for the summer, then returning to school to graduate before working the startup full-time. They wanted to know if I was working alone or if I had others working for me. They did not offer any sum certain for my trademark, although they expressed a want for it. When I indicated that I intended to reserve all rights for use of my mark and mentioned my plan for a derivative SPARK IT, they said they would call me back when they had decided whether or not simply to find another name (i.e. mark) for their startup.

37.    On our phone call, I did not know what to expect. I had beforehand conducted due diligence and discovered that these students had the 'mentorship' of Lyor Cohen, whom I had never heard of before, who had some

---

[14] EXHIBIT N

[15] EXHIBIT O

[16] EXHIBIT P

connection with WMG a.k.a. Warner Bros., and that these students had already styled themselves as the "founders" of "SoundSpark" (SOUNDSPARK)[17]. They seemed haughty and high because of their connections to "influence." They seemed uninterested in joining my talents and skills with theirs, nor in making any *bona fide* offer of compensation for my trademark, which they simply wanted to possess. I mentioned that I was looking for investors and would appreciate their help. I indicated that I wanted my mark reserved for my own ideas, and that, if they thought their idea had promise, they ought to distinguish it with a different name and mark. This, I believe, I said professionally and respectfully, though assertively and defensively.

38.   On the same evening as our 20-minute phone call, Christopher Nolte called me back to say briefly that they would find another name. I sent a follow-up email[18] to Ana Villanueva and Christopher Nolte in order to document this fact, and also because I was curious and interested in reaching out to them. There was no timely reply or acknowledgement.

39.   On August 15, 2014, I first became aware that "SoundSpark Inc." was filed[19] with the Secretary of State of Delaware, as I was searching for my own entity "Sound Spark Studios LLC." I believe, it is suspicious that Lyor Cohen, despite being a close advisor, appears not a director of the Delaware entity "SoundSpark Inc.", and I believe, it may be for reason of attempting to veil liability or possibly even to 'confer' liability onto the MIT students.

40.   I might have assumed that the defendants had formed a corporation before they were aware of me and that, subsequent to knowing me, articles already *en route* or received were filed with the Delaware Secretary of State. However, I now believe, in light of the evidence, that this filing was made with knowing bad faith.

41.   On August 17, 2014, I sent an email[20] to "info@threehundred.biz", via a website contact form, to notify Lyor Cohen of my claim to trademark rights and to attempt negotiation. I received no reply or acknowledgement for this message.

42.   On August 19, 2014, the newly formed entity SoundSpark Inc. filed a federal trademark application for "SPARKIT" with no mentioning of music or entertainment, though clearly related to the same, and SPARKIT replaced all public instances of SOUNDSPARK on webpages controlled by Ana

---

[17] EXHIBIT Q

[18] EXHIBIT R

[19] EXHIBIT S

[20] EXHIBIT T

Villanueva and Christopher Nolte[21]. However, I note and have become increasingly aware that they have continued to use a stylized design consisting of two "S" letters, which seems deliberately intended to continue the consumer's association of the defendants and SOUNDSPARK.

43.     Concurrently, on August 19, 2014, I received an email from Christopher Nolte, and I believe that this was an emotional reaction of hubris on his part, resulting from my direct communication attempt with Lyor Cohen on August 17, 2014. Nevertheless, I addressed him and proceeded to demand that the defendants cease and desist infringing activities on August 20, 2014[22].

44.     I received no acknowledgement for my message and demand to cease and desist, sent on August 20, 2014.

45.     I received no acknowledgement for my final message to the defendants on August 22, 2014, an attempt to establish good faith amicable relations[23].

46.     On August 21, 2014, SoundSpark Inc. filed a federal trademark application for "TAPTAPE" and *added* TAPTAPE to their webpages in place of the previous SOUNDSPARK and SPARKIT while still continuing to use the stylized design consisting of two "S" letters[24].

47.     I believe, TAPTAPE is a decoy intended to make me believe, while not true in fact, that the defendants have changed their mark and abandoned SOUNDSPARK and SPARKIT.

48.     Contrary to representation, the defendants have evidently not complied with a spoken agreement that they would find another *mark* nor with my demand to cease and desist use of or reference to "Spark" as a *mark* in relation to music and entertainment.

49.     In addition, *the addition* of the word mark TAPETAPE to the defendants' webpages and *failure to remove or state a claim of fair use for my mark while continuing to possess and use my mark* in the form of the web domains "soundspark.me" and "sparkit.io" and a design consisting of two stylized "S" letters, they have claimed are their "initials," indicates that they are still willfully utilizing the aforementioned as counterfeit marks to deceive consumers as to the origin of goods and services.

---

[21] EXHIBIT U

[22] EXHIBIT V

[23] EXHIBIT W

[24] EXHIBIT X

50.    My trademark registered on the principal register as United States Trademark Registration No. 4,606,004 on September 16, 2014. This ought to have been, and is, and I shall continue to uphold as, constructive notice of my ownership of the mark pursuant to Title 15 U.S.C. §1072. Public notice of my trademark's registration has been given on my website "soundsparkstudios.com"[25].

51.    On September 27, 2014, I discovered, realized, and connected the Theory Entertainment LLC trademark applications and SoundSpark Inc. trademark applications with the behaviors, actions, and interactions aforementioned to deduce my conclusion.

52.    On October 3, 2014, while writing this complaint, the website at the web domain "threehundred.biz" was changed[26] to a single-view page that continues to use the 300 Entertainment word mark and design mark, each, when clicked, directing consumers to social media webpages. The website no longer displays known associates. The website also mimics my own "soundsparkstudios.com" in respect to its minimalism. I believe that the vulgarity displayed in connection with my mark is damaging.

53.    There is a count-down timer indicating the day October 21, 2014. I suspect that, on this day, "threehundred.biz" may be discontinued and a new website may launch, and I continue to be wary of the infringing web domain "soundspark.me", of which the MIT students may release control to their 'mentor' and associate Lyor Cohen, in order to complete his possession of the distinguishing features of U.S. Trademark Reg. No. 4,606,004.

54.    Also, on October 3, 2014, I noticed that social media webpages, such Facebook and Twitter, for 300 Entertainment, began using the mark "IT'S A NEW DAY"; I believe, this is an effort to further dilute SPARK (with DAY). And a design mark consisting of the number "300", with dashes surrounding it, also indicates an effort to dilute SPARK with imagery that is commonly associated with light emanating from a source (SPARK), such as a lightbulb. A banner on the site also displays the abstract colors blue, red, black, yellow, and green; this indicates an intent to dilute my claims to colors gold, red, and blue. They also mock (me?) with a tombstone displaying the 300 Entertainment design mark, the dates "May 22, 2014-October 1, 2014" and the words "He not busy being born is busy dying," which may hint at the defendants' intention to assert *laches* regarding my claims. I, however, do assert to the contrary that I have properly owned all my claims and that I have been timely with this action.

---

[25] EXHIBIT Y

[26] EXHIBIT Z

CONCLUSION

55.     The defendants collectively seem to have had the following intention in infringing United States Trademark Registration No. 4,606,004: "SOUND" is already disclaimed from exclusive right and concentric ovals may not be distinctive in relation to "SOUND"; "STUDIOS" is already disclaimed from exclusive right; if "SPARK" is diluted, then both "SPARK" and the gold-encircled eight-point star, which may not be distinctive in relation to "SPARK", are removed from distinctiveness in relation to entertainment; and if the impression of the triangular arrangement of the literal elements together "SOUND SPARK STUDIOS" is diluted, then the whole of United States Trademark Registration No. 4,606,004 is diluted and removed from distinctiveness in relation to entertainment.

56.     I believe that the defendants, namely Lyor Cohen and Warner Music Group Corp., have conspired to remove me from rightful ownership of my Registered Trademark with the willful intent of having it for their own use—a fraudulent renaming of WMG.

57.     I, Jeremy Southgate, again, so swear that this is true to the best of my own full knowledge and belief.

COMPLAINTS AS A MATTER OF LAW

58.     I believe that the trademark applications filed by Theory Entertainment LLC, et al., for the design mark used by 300 Entertainment, having the serial numbers 86077961, 86077951, 86077989, 86077980, and 86077972, are knowingly counterfeit, have willfully infringed Reg. No. 4,606,004 (i.e. triangle shapes, the number three), and have been presented with false representations of fact to the United States Patent and Trademark Office, and these are causes for action pursuant to Title 15 U.S.C. §1114, Title 15 U.S.C. §1125, and Title 18 U.S.C. §1001.

59.     Furthermore, I believe that the trademark applications filed by Theory Entertainment LLC, et al., for the word mark used by 300 Entertainment, having the serial numbers 85913117, 85913136, 85913099, 85913128, and 85913108, are counterfeit, in light of Evidence, constitute willful infringement of Reg. No. 4,606,004 (the number three), and have been presented with false representations of fact, in light of Evidence, to the United States Patent and Trademark Office, and these are causes for action pursuant to Title 15 U.S.C. §1114, Title 15 U.S.C. §1125, and Title 18 U.S.C. §1001.

60.     I believe that the Delaware entity "SoundSpark Inc.", formed by two graduate students from the Massachusetts Institute of Technology, Ana Villanueva and Christopher Nolte, who have continuing support, financial and otherwise, of Lyor Cohen, et al., is knowingly counterfeit, and the entity's

connected commercial activities are willful infringement of Reg. No. 4,606,004 (SOUNDSPARK), and these are causes for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

61. I believe that the persons mentioned in the previous paragraph have willfully conspired to register my service mark **SPARK IT**ˢᴹ with a false representation, having the serial number 86371371, to the United States Patent and Trademark Office, with respect to ownership and with respect to how the mark will actually be used in connection with services, by way of omission of reference to music, and they have knowingly counterfeited and committed willful infringement of Reg. No. 4,606,004 (SPARK), and these, I believe, are causes for action pursuant to Title 15 U.S.C. §1114, Title 15 U.S.C. §1125, and Title 18 U.S.C. §1001.

62. I believe that the persons mentioned in the previous two paragraphs have knowingly counterfeited and willfully infringed Reg. No. 4,606,004 (S, SPARK, SOUNDSPARK), in the form of the web domains "soundspark.me" and "soundspark.co" and "sparkit.io" and their design mark, consisting of two stylized "S" letters, and I believe that these are causes for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

63. I believe that Lyor Cohen, Warner Music Group Corp., and others, in addition to the above mentioned, have knowingly and willfully counterfeited, infringed, and diluted Reg. No. 4,606,004 with the use of a design consisting of the number "300", a design mark consisting of the number "300" inside a circle of dashes, and the colors blue, red, black, yellow, and green, and I believe that these are causes for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

64. Finally, I believe that intentions of the defendants, with the summation of these infringing acts, are knowingly and willfully to dilute Reg. No. 4,606,004, as a whole, to the point where it, under my ownership, is no longer distinctive in relation to goods and services in entertainment, and this, I believe, is a very great cause for action pursuant to Title 15 U.S.C. §1125.

## FIRST ADDENDUM TO COMPLAINT

65. I, Jeremy Southgate, hereby affirm under penalty of perjury that the following is true to the best of my own full knowledge and belief.

66. After timely filing papers with the Court on October 6, 2014, on October 7, 2014, I noticed, on social media webpages of the defendants, namely 300 Entertainment (Facebook, Instagram, Tumblr, Twitter, etc.), a sequence of three 'black-and-white' ("greyscale") videos showing a photoshoot of associates of 300 Entertainment. All three videos display, at the top, the same banner ("Color Bar"), mentioned in paragraph fifty-four (54) of this complaint, of the

colors blue, red, black, yellow, and green. In addition, noticeably at the end of each of the three sequential videos, is an evident representation of a 'picture frame' only containing a solid color: red, blue, and green, one color for each video. This, I believe, indicates yet another willful attempt to counterfeit, infringe, and dilute the colors red, blue, and gold (green is a mix of blue and gold) of US TM Reg. No. 4,606,004, and I believe, these are further causes for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

67.    In addition to the facts of the above paragraph, on October 7, 2014, there was a greyscale video, wherein visuals accompany a 'sound recording', with the same impressing banner of the colors blue, red, black, yellow, and green, of a featured drummer, whose singing and vocalizing includes the words "It's a New Day", therefore infringing SPARK (DAY), and playing in a public subway (assumed to be in New York City). I believe, this is further use of a knowingly counterfeit mark and willful infringement and dilution, and I believe that these are further causes for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

## SECOND ADDENDUM TO COMPLAINT

68.    Correction: Lyor Cohen was CEO of recorded music at Warner Music Group ("WMG") and oversaw operations in North America and Europe. He was the highest paid employee at WMG (Third Addendum to Evidence, Article Five).

69.    Correction: The website at the web domain "threehundred.biz" appears (Third Addendum to Evidence, Article Three) to have been launched in the form as seen in Exhibit H on June 24, 2014, around which time the website for Sound Spark Studios at the web domain "soundsparkstudios.com" also had a grey theme.

70.    News sources indicate that, at the time of his departure from WMG, Lyor Cohen was in the process of negotiating (Third Addendum to Evidence, Article Five) a new contract, with personal compensation possibly of up to $11 million per year, plus stock options, before his suspiciously abrupt departure from WMG. I question Lyor Cohen's capacity for judgement if he forfeited a position of power and influence and $11 million, plus options, per year, in exchange for only "risk."

71.    News sources indicate that, around the time of Lyor Cohen's departure from WMG, Lyor Cohen was extremely secretive about his new project and referred to this project in emails and phone conversations only by means of some "nonsensical" code (Third Addendum to Evidence, Articles One and Six).

72.     News sources indicate that it was Lyor Cohen who initiated all talks and subsequent apparent agreements, predominantly with Google, to invest (indicated in Evidence Exhibit I and Third Addendum to Evidence, Articles Two, Four, Seven, and Eight), WMG and its subsidiary Atlantic to distribute, and Twitter to provide data analysis and publicity services. If any investing entity included knowledge of infringement of US TM Reg. No. 4,606,004 in its consideration to invest, I believe, this is a cause for action against it under principles of equity.

73.     News sources indicate that Tory Burch, as Lyor Cohen's girlfriend, with children of her own, and as a business woman, with a brand, to protect from association with anything unsavory, may have been wary (Third Addendum to Evidence, Article Nine) of his future circumstances. Lyor Cohen and Tory Birch ended a personal relationship of five years in February, 2013, shortly after Lyor resigned from WMG. Therefore, it may appear probable that Tory Burch had some knowledge or suspicion of Lyor Cohen's intentions with respect to his venture in 300 Entertainment.

74.     On October 15, 2014, another series of nine (9) videos was posted to the social media webpages of 300 Entertainment (e.g. Facebook, Instagram, Tumblr, Twitter).

75.     The motion images in these videos are primarily greyscale; however, each continues to display a mark consisting of the colors blue, red, black, yellow, and green, which, I believe, is intended to dilute the colors, BLUE, RED, and GOLD, in particular, of US TM Reg. No. 4,606,004. I believe, this is further cause for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

76.     In addition, a majority of the videos display a stand-out freeze-frame image in which the trio of colors from US TM Reg. No. 4,606,004, BLUE, RED, and GOLD, in particular, are noticeable as a complete group of three to the discerning eye. It is also possible that these images were edited by 300 Entertainment to enhance the presence, obviousness, and impressiveness of infringing colors. This, I believe, is increasingly bold and blatant copy of US TM Reg. No. 4,606,004. I believe, this is further cause for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

77.     In addition, each video ends with an animation image that is used consistently at the end of each video to designate the origin of the goods (videos with musical sound recordings and used as advertising in relation to a music company), representing an animated anthropomorphic figure having the colors blue, red, and dark gold (or a tone of brown or dark orange that evokes yellow tones such as the color gold); the mark also includes an overlaid literal word element "POLO" (I wonder if they think they are playing a game of 'marco polo' with trade mark-o-POLO), which evokes the manner of overlay of the literal

words "SOUND SPARK STUDIOS"; the mark also includes imagery of a burning cigarette-like joint, where the 'burning' evokes imagery of a "SPARK"; the arrangement of a paintbrush, baton, and hair-and-hat, as three elements, also form the impression of an upside-down triangle. In sum, I believe that this image flagrantly incorporates all distinctive elements of US TM Reg. No. 4,606,004; as such, the image is knowingly counterfeit and constitutes willful infringement and dilution of US TM Reg. No. 4,606,004. In addition, the subject matter of the image is vulgar, offensive, and damaging to US TM Reg. No. 4,606,004. I believe, this is further cause for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

## THIRD ADDENDUM TO COMPLAINT

### JOINDER OF DEFENDANTS

I, Jeremy Southgate, hereby (have) amend(ed) this Complaint as a matter of course or (have) move(ed), if the Court finds it fitting and just, to join the following new defendants to this Action, pursuant to Rule 20 of the Federal Rules of Civil Procedure, on the grounds that, I believe, they have had knowledge of, interests in, and willful agency in, by means of comfort, aid, and finance, infringement of United States Trademark No. 4,606,004.

### ADDITIONAL DEFENDANTS

78.    300 Entertainment Music Publishing LLC is a Delaware limited liability company; Access Industries, Inc., is a Delaware corporation; Access Industries, LLC, is a Delaware limited liability company; Access Industries Holdings LLC is a Delaware limited liability company; Andres Santo Domingo is a citizen of New York; Alex Zubillaga is a citizen of New York; Aryeh Bourkoff is a citizen of New York; Atlantic Recording Corporation is a Delaware corporation; Bain Capital, LLC is a Delaware limited liability company; Columbus Nova Advisors LLC is a Delaware limited liability company; Columbus Nova Asset Management LLC is a Delaware limited liability company; Columbus Nova Management LLC is a Delaware limited liability company; Columbus Nova Partners LLC is a Delaware limited liability company; Craig Kallman is a citizen of New York; Edgar Bronfman Jr. is a citizen of New York; Google Inc. is a Delaware corporation; Google LLC is a Delaware limited liability company; iHeartMedia, Inc. is a Delaware corporation; Julie Greenwald is a citizen of New York; Kevin Liles is a citizen of New Jersey; Len Blavatnik is a citizen of New York; LionTree Advisors LLC is a Delaware limited liability company; LionTree Capital Partners is a Delaware limited liability company; LionTree LLC is a Delaware limited liability company; LionTree Media is a Delaware limited liability company; LionTree Partners is a Delaware limited liability company; Massachusetts Institute of Technology is a Massachusetts university school; Neil Zamil is a citizen of New York; Noam Gottesman is a citizen of New York; Ori Winitzer is a citizen of New York; Pete

Giberga is a citizen of New York; Providence Equity Partners L.L.C. is a Delaware limited liability company; Roger Gold is a citizen of New York; Stephen Cooper is a citizen of New York; Thomas H. Lee Partners, L.P. is a Delaware limited partnership; Time Warner Inc. is a Delaware corporation; Todd Moscowitz is a citizen of New York; Toms Capital Inc. is a Delaware corporation; Toms Capital LLC is a Delaware limited liability company; Toms Capital Management is a Delaware limited liability company; Twitter Inc. is a Delaware Corporation; WMG Holdings Corp. is a Delaware corporation.

## JURISDICTION AND VENUE FOR ADDITIONAL DEFENDANTS

79.    Jurisdiction and venue remain proper pursuant to Title 15 U.S.C. §1121 and Rule 20(a)(2) of the Federal Rules of Civil Procedure, Title 15 U.S.C. §15, and Title 28 U.S.C. §§ 1331, 1337.

## FURTHER DEVELOPMENTS
## MATERIAL TO FINDING OF INFRINGEMENT

80.    I, Jeremy Southgate, hereby affirm under penalty of perjury that the following is true to the best of my own full knowledge and belief.

81.    The additionally joined defendants of paragraph seventy-eight (78) have been identified[27] as close "investors", or close "partners", or close "associates" or "officers" of some investing or partnering entity, in Trust and connection with Lyor Cohen and 300 Entertainment.

82.    On October 17, 2014, 300 Entertainment posted to its social media pages (e.g. Facebook, Twitter, Instagram) another video[28] featuring a musical sound recording in which the Color Bar, consisting of the colors blue, red, black, yellow, and green, is present while the video begins in greyscale; then, in a flash (SPARK imagery) of a blue tone, the Color Bar becomes greyscale and the video subject—a 'neon sign' consisting of the literal characters "300"—is illuminated as overlaid in blue and becomes gold while red emanates from the subject. I believe, this is another new and blatant form of knowingly counterfeit willful infringement, and I believe that this is further cause for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

83.    All evident instances of the stylized characters "300" (300 Entertainment), generally found, also appear to include overlapping ovals, for the two "0" characters, as an infringing feature of concentric ovals in US TM Reg. No. 4,606,004.

---

[27] Evidence, Exhibit I

[28] Fourth Addendum to Evidence, Neon 300 Video

84.    Also, on October 17, 2014, I received a letter of correspondence[29] ("WBEI 10/17"), from Warner Bros. Entertainment Inc. ("WBEI"), which stated that my complaint had "come to [WBEI's] attention" (WBEI 10/17, first full paragraph).

85.    WBEI stated, correctly, that I had a "belief that there is some current *association* between WBEI and Warner Music Group" ("WMG") (WBEI 10/17, second full paragraph).

86.    WBEI then proceeded to mutate my claim against WBEI into what I had not intended the claim to be in my original Complaint. WBEI incorrectly defined my claim as based strictly on publicly announced *ownership*, and therefore, based on this incorrect assumption, WBEI has claimed to believe that my claim against WBEI is unfounded.

87.    The statement that "WMG and WBEI were, at one time under common ownership by Time Warner Inc. [but] this has not been the case for many years" (WBEI 10/17, third full paragraph), is true but is not the whole Truth of the matters which I have brought before the Court by means of this Action. I believe, the statement is deliberately misrepresentative.

88.    The word "*own*," I believe, is defined as "pulling toward oneself," by the "owner." "To own up to something" ("up" indicates "affirmative") or "To own something," is to consciously and deliberately acknowledge and take responsibility for an objective thing.

89.    Therefore, in the meaning of the previous paragraph, it is true that Time Warner Inc. and WBEI claim that they are not "owning up" to my claim against WBEI. However, I believe, WBEI may still be found liable without overtly found *ownership*.

90.    WBEI made known an intention to file "a motion to dismiss the case against WBEI for failing to state a claim" (WBEI 10/17).

91.    In reference to the previous paragraph, I believe that WBEI has overlooked or is feigning ignorance of Paragraph Thirty-Two (32) of my original Complaint, in which I find my claim against WBEI, specifically, because there is strong and direct correlation of my first contact with the MIT student infringers—agents of Lyor Cohen, who is connected to WMG, which is connected to WBEI nominally as well as by common interest—and logged visits from WBEI to my website, demonstrated by Exhibit I of Evidence, where "Warner Bros. Entertainment Inc." is specifically the IP Address owner and registrant of each entry to the log.

---

[29] Fourth Addendum to Evidence, WBEI Letter 10/17

92.    WBEI asserted that it might "seek to recover an award of attorney's fees against [me] personally on the ground that [they believe] no reasonable inquiry could have been made regarding the validity of claims against WBEI prior to the complaint['s] being filed," if I did not allow the claim against WBEI to be dismissed.

93.    In reference to the previous paragraph, and the whole of WBEI 10/17, I cannot find agreement with any of WBEI's *assertions for deterring* my continuance of serving civil process against WBEI.

94.    On October 20, 2014, I sent a letter of response[30] ("Southgate 10/20") to Wayne M. Smith, a senior litigator, of WBEI, to address the claims put forth in WBEI's letter of October 17, 2014, and to elaborate on the claim against WBEI in my original Complaint.

95.    I affirmed my good faith before the Court. "I am only interested in bringing an action against a defendant from whom or which I can rightfully claim relief" (Southgate 10/20).

96.    I asserted that I believed WBEI had waived its claim to reasonable attorney's fees even if, hypothetically, the Court found that there was no "reasonable inquiry...regarding the validity of claims against WBEI," because WBEI has allowed WMG, royalty-free, to use its mark "WARNER" and has allowed the blurring of the two companies for the general public, myself included. Therefore, WBEI has knowingly allowed a likelihood of confusion between WBEI and WMG.

97.    However, I believe, I demonstrated "*reasonable inquiry...regarding the validity* of the claims against WBEI" (WBEI 10/17), to Wayne Smith, when I demonstrated that WBEI's citation, in their Correspondence of October 17, 2014, of Securities and Exchange Commission ("SEC") Form 10-Q, filed by Time Warner Inc., on May 7, 2014, appears deliberately to be omitting *material evidence of association* between Time Warner Inc. (parent of WBEI) and WMG, as per the following excerpt from the SEC filing of Time Warner Inc.: "On March 1, 2004, the Company closed on its previously announced agreement to sell the Warner Music Group's ("WMG") recorded music and music publishing operations to a private investment group for approximately $2.6 billion in cash and an option to re-acquire a minority interest in the operations sold."

98.    WBEI neglected to include a substantial clause and even to include an indication of ellipsis ("...") of a substantial clause by the omission of the following: Time Warner Inc. 'sold WMG'...for cash "*and an option to re-acquire a minority interest in the operations sold.*"

---

[30] Fourth Addendum to Evidence, Southgate Letter 10/20

99.    I believe, I may assume that the "option," referred to in the previous paragraph, was exercised, because I believe that the intent to exercise the option is actually implied in the filing of the statement.

100.   Twelve minutes after I sent my Letter of Response of October 20, 2014, I received a reply email[31] from Wayne Smith, of WBEI, who acknowledged review of my letter and stated his opinion that my claims were "speculative assertions" and that "It is not up to WBEI to 'prove' anything," which, respectfully, I believe, may indicate laziness and a reliance on the comfort of being "hopeful that...[my] either dismissing WBEI from the complaint or allowing WBEI to be dismissed [*sic*]" (WBEI 10/17) or *maybe*, although I doubt, *bona fide* incredulity for the possibility that my claims might be legitimate.

101.   Continuing from the above paragraph, Wayne Smith also said to me, "I suggest that you immediately review the requirements under Rule 11(b) and (c) of the Federal Rules of Civil Procedure and govern yourself accordingly." Again, I would like to believe that Wayne Smith has *bona fide* incredulity for the possibility that my claims might be legitimate; in which case, I ask his pardon. However, it is also possible that he means to assert another *assertion for deterring* my rightful service of process against WBEI. If the latter is the case, then I believe that Wayne Smith has not governed himself according to the American Bar Association's Rules of Professional Conduct, Rule 4.1, because I affirm that I have faithfully represented all matters to the Court pursuant to Rule 11, and yet Wayne Smith has appeared to me to have implied that I am liable for Sanctions, merely based on my perceived representations to Wayne Smith and WBEI, which I have not found to be governed by Rule 11.

102.   On October 21, 2014, 300 Entertainment launched a new website[32] at the web domain "300ent.com", which includes a video feature and which continues general, all-around infringement of US TM Reg. No. 4,606,004, in the manners aforementioned.

103.   As referenced in the above paragraph, the new 300 Entertainment website also includes a logo that is similar to a mark used by Cable News Network Inc. ("CNN"), and I believe, this inclusion supports evidence of allowance and association between Time Warner Inc. (which owns Turner Broadcasting System Inc., which owns CNN) and 300 Entertainment. This logo appears used to to support color infringement and infringement of implying a news studio 'ticker' (STUDIO) that impresses the viewer with a megaphone image (SOUND) that emits 'lightning bolts' (SPARK). Similarly, 300 Entertainment's use of the Color Bar supports evidence of its allowance from and association with Google, but I deny, in light of Evidence, any claims of

---

[31] Fourth Addendum to Evidence, Wayne Smith Email 10/20

[32] Fourth Addendum to Evidence, 300Ent.com 10/21/14

rightful use, by allowance from another famous mark's owner, on new goods and services that infringe the rights of US TM Reg. No. 4,606,004. I believe, 300 Entertainment has not acquired any distinctiveness on its own merit; I believe, it cannot justly be allowed to assert that "acquired distinctiveness" 'rubbed off' from its sponsors-in-Trust (Time Warner, CNN, Google).

ARGUMENTS CONCERNING RESPECTIVE LIABILITIES
OF THE DEFENDANTS

104.    I believe that liability for trademark infringement may possibly be found for any associate that (1) proves to have an "investment contract" in support of fraudulent infringement and (2) knows that he, she, or it is investing in fraud for profit.

105.    I have found a definition of "investment contract" from the following: "For purposes of the Securities Act, an investment contract (undefined by the Act) means a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise" (Securities and Exchange Commission v. W.J. Howey Co., 328 U.S. 293).

106.    Although this Action does not arise under the Securities Act, *per se*, I believe, it is fitting to take the definition of an "*investment contract...* immaterial whether the shares in the enterprises are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise" and apply it to corporate or investor liability in this case.

107.    In addition to the above two paragraphs, an "investment contract" was defined more simply as the following: "the placing of capital or laying out of money in a way intended to secure income or profit from its employment," and this definition was said to be "crystallized" in its meaning prior to the passage of the Securities Act by Congress (Securities and Exchange Commission v. W.J. Howey Co., 328 U.S. 298).

108.    Deduced from the applied definition of the previous three paragraphs, it does not matter whether "ownership" is "evidenced by formal certificates," such as articles of incorporation, "or by nominal interests." If Time Warner Inc. has "nominal interests" in a venture with Lyor Cohen and WMG, et al., as evidenced by its trademark, SEC filings, and cooperative agency of WBEI; or, if other investors (defendants) have "nominal interests" by public advertisement of association with, support of, and investment in a venture that is found to be based solely on the fraudulent infringement of a United States Registered Trademark: then, I believe that these defendants, as a common

venture, or Trust, are liable because of said willful investment in support of said fraudulent infringement.

109.   In contrast to SEC v. W.J. Howey Co., the defendants in this case, I believe, are not wronging *innocent (clean) public* investors by offering "opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the...products."

110.   I believe, the defendants may be offering closely-held investment opportunity to *unclean private* investors who reside in close localities and who indeed have the equipment and experience requisite to the cultivation, harvesting, and marketing of products, unfair advantage, and yet they similarly wrong innocent (clean) Consumers of the Public, by possessing advantage and monopoly that restrains innovation and commerce, for their own self-interest.

111.   By virtue of a finding of infringement, closely associated investors who, despite their advantages which could have been used for just enrichment, invested in infringement (*uncleanliness*), as a method for unjust enrichment, may be found to have acquired "unclean hands."

112.   Moreover, *but for* the apparent infringement of US TM Reg. No. 4,606,004, investors may have had little incentive to invest in a new venture in a struggling music industry.

113.   I believe, the newly joined defendants each had no right to enter into an investment contract with other defendants if said investment included any feature of US TM Reg. No. 4,606,004 as explicitly or implicitly contingent in its consideration.

## COMPLAINT FOR DEFAMATION
## RESULTING FROM INFRINGEMENT

114.   Public advertisement of investment in "Lyor Cohen's venture 300 Entertainment," I believe, amounts to a public false claim, by the defendants, that Lyor Cohen and 300 Entertainment are the true authors and owners of marks that, I believe, are known or ought to have been known by them to be counterfeit.

115.   Deduced from the previous paragraph, such a false claim damages me, by leading to a lack of confidence in me with respect to my claim to proper authorship and intellectual property, although my claim to that public recognition of authorship and property is rightful, and the defendants have no such claim of right.

116.   Deduced from the previous two paragraphs, I believe that the standards of defamation, of the mark's true owner, are met; as likewise, the mark is defamed and removed from renown for its true owner's intended purpose. US TM Reg. No. 4,606,004 and I, its true and rightful owner, by the wrongful infringing actions of the defendants, are wrongfully removed and restrained from (*de*) fame and *salience* for all consumers and the public-at-large.

117.   I believe, notwithstanding the possibility of remedy on grounds of defamation *per se*, a finding of defamation is evidence of unfair and exclusionary competitive practices.

CLAIM OF RIGHT AS AN AUTHOR AND INVENTOR
AND
A CONSTITUTIONAL ARGUMENT
WITH RESPECT TO MUSICAL ARTS IN THE YEAR 2014
AND
COMPLAINT FOR MONOPOLISTIC PRACTICES

118.   As the rightful owner of US TM Reg. No. 4,606,004, I have never received acknowledgement for my efforts to find investment for a distinctive mark and a multitude of ideas for goods and services, nor have any of these potential investors, in Lyor Cohen and 300 Entertainment, who are probably aware of my trademark and ought to be aware of my ownership of my trademark, offered to add value to my brand and to share, fairly and honestly, any profits thus arising with me.

119.   I believe, the defendants are probably aware of my trademark because there appears to me no distinguishable product, except for articles that infringe US TM Reg. No. 4,606,004, offered by Lyor Cohen, 300 Entertainment, or the music industry-at-large that warrants such a high degree of enthusiastic investment, in common and by each of the defendants. And, I continue to believe: Lyor Cohen et al. have carried out actions that are obviously in bad faith and improper, in fact, in light of Evidence.

120.   I believe, I would easily find investment *but for* the ease which the defendants have to copy, dilute, and infringe my intellectual property rights because of finance and power, which they hold jointly in Trust, which has become increasingly unjustified with respect to "promot[ing] the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" (United States Constitution, Article I, Section 8, Clause 8) ("Constitution I 8 8").

121.   In the meaning of Constitution I 8 8, I believe, none of the defendants is properly an Author or Inventor offering Progress with respect to the goods and services at issue.

122.   The defendants may have connections to ownership of the products, of Authors and Inventors, which may have been acquired rightfully by means of Contracts. However, I deduce from the previous two paragraphs, from Constitution I 8 8, and from legal theories for "piercing the veils" of corporations as debit for real liability and for "diluting" trademarks based on the degree of failure to use: just so, there is a debit, dilution and weakening, of rightful claim by Trusts, who against the meaning of Constitution I 8 8, obtain exclusive rights from the meaning of Constitution I 8 8, by means of investment contracts that arise merely to exact profit from a work of an Author or Inventor—as opposed to—to exact the work-product of an Author or Inventor, that was properly bought or patronized, with the motive of Capital Returns, for benefit and Progress of Society.

123.   News sources have indicated and found it worthy to mention, as recently as October 17, 2014, that the Year "2014 will mark the first year since its inception in 1976 that no artist's album will be certified as platinum from sales," where "platinum" indicates sales of over one million (1,000,000) units and an "album" indicates, typically, at least eight (8), or on average twelve (12), songs (musical sound recordings).

124.   Well-respected Musician Experts have commented negatively about the Music Industry-at-large[33].

125.   As I have previously referenced "unfair competitive practices" in paragraphs six through one hundred and seventeen (6-117), I believe, in light of Evidence, the defendants have entered into an investment contract and conspiracy, a Trust, to monopolize a part of commerce, in restraint of commerce, and there is cause for action against the defendants pursuant to Title 15 U.S.C. §1, Title 15 U.S.C. §2, Title 15 U.S.C. §15, and Title 15 U.S.C. §24.

## FOURTH ADDENDUM TO COMPLAINT

### FURTHER DEVELOPMENTS AND REALIZATIONS

126.   The fact that WBEI demonstrated my Complaint "came to [its] attention" (Paragraph 84), within three days of the publication of the Complaint filing in the public court docket, also demonstrates the likelihood (asserted in Paragraph 15) that my trademark application for US TM Reg. No. 4,606,004 "came to the attention" of WMG soon within three months after becoming published and searchable in the databases of the United States Patent and Trademark Office.

---

[33] Fourth Addendum to Evidence, Testimony from Music Professionals

127.   As part of the new 300 Entertainment website (Paragraph 102, "300Ent.com"), all features of US TM Reg. No. 4,606,004, are summarily infringed and diluted. Addendum[34]: a video loop of a 'news stand', which is clearly staged and acted by 300 Entertainment associates. Lyor Cohen, Kevin Liles, and Todd Moscowitz are seen briskly walking by; a man wearing a shirt with "*300*" imprinted is prominent; a *STUDIO news* ticker depicts "*SOUND SPARK*" and '*sound recordings*'; to the right of the news stand, a man in a bright *red* sweater stands in the vicinity of a man who approaches with a bright *blue* backpack while a bright *yellow* taxi passes by; a drop-down menu bar, accessible from anywhere on the website, displays the *Triangle* Mark.

128.   As part of the new 300 Entertainment website (Paragraph 102, "300Ent.com"), a website 'biography' titled "Form and Function"[35] copies and mimics the biography of my own website (soundsparkstudios.com/jeremy), as a means of creating confusion as to how the infringing website was 'designed'; it gives the public (consumers) a false impression that the use of the Color Bar and other infringing elements (marks) on the website (300Ent.com) are legitimate marks belonging to and designating 300 Entertainment, Lyor Cohen, et al..

129.   Published on October 23, 2014, as part of the new 300 Entertainment website (Paragraph 102, "300Ent.com") and advertised on October 29, 2014, on social media websites (e.g. Facebook), a series titled "It's a New Day Zine"[36] or "I'm Only Bleeding" appears to be a new form of willful counterfeit infringement and dilution against US TM Reg. No. 4,606,004, because it is another recurring *series* that trains the public (consumers) to remember its origin by the consistent use of *blue* text (infringing the blue literal elements "SOUND SPARK STUDIOS") *overlaid* on a *red* background (infringing the impression made by two red concentric rings). I believe, this is further cause for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

130.   Since the advertisement, mentioned in the above paragraph, indicated that 300 Entertainment would be taking notice from consumer participation, by the instruction, "Comment below in 1 word what RISK means to you. We'll notify you if you're chosen...," I took the opportunity on October 31, 2014, to make certain that actual "NOTICE"[37] of **"Sound Spark Studios®"** was given to 300 Entertainment and TapTape, by means of their Facebook webpages, pursuant to Title 15 U.S.C. §1111.

---

[34] Fifth Addendum to Evidence, Article One

[35] Fifth Addendum to Evidence, Article Two

[36] Fifth Addendum to Evidence, Article Three

[37] Fifth Addendum to Evidence, Article Four

131.   A news source[38] has indicated, as recently as October 21, 2014, that 300 Entertainment has "an estimated $15 million in financial backing," a 'war chest', "from high-profile companies including Google and Rhapsody stakeholder Columbus Nova." Therefore, I believe, the defendants have not experienced barriers, but rather great ease, to creating an *elaborate scheme* for infringement.

## DEGREE OF PLAINTIFF'S INVESTMENT IN TRADE

132.   My mark and brand also represent my own *Expense, Time, and Effort* (Formal Paid Instruction), in the form of Instrumental Skills: Violin (~1996, 1999-2000, 2002-2011), Piano (~1998-1999), Clarinet (2001), Guitar (2014-present).

133.   My mark and brand also represent my own *Time and Effort* (Self-Study), in the form of Instrumental Skills: Violin (2012-present), Guitar (2004-present), Voice (1998, 2003-present), Bass Guitar (2012-present), Mandolin (2013-present), Vocal Percussion (2010- Present), Drums & Percussion (2013-present), Music Production (2011-present), Piano (2011-present).

134.   My mark and brand also represent my own *Time and Effort* (Self-Study), in the form of Programming Languages (2013-present): HTML, CSS, Javascript, PHP, JQuery, AJAX, JSON, SQL.

135.   My mark and brand also represent my own *Time and Effort* (Self-Study), in the form of Law Knowledge (2010-present): *The Constitution of the United States of America, Overview of Intellectual Property for Business Lawyers* by Kinney & Lange, *Federal Rules of Civil Procedure*, Title 15 U.S.C. §1 et seq., Title 15 U.S.C. §1051 et seq..

136.   My mark and brand also represent my own *Expense, Time, and Effort* (Accredited Study), in the form of Courses of Study: *American Civilization (2010)* at the University of Chicago (Illinois); *Latin Language and Literature* (2002-2009) at Dexter School (Massachusetts); *English Language and Literature* (2001-2009) at Dexter School; *German Language and Literature* (2006-2008) at Dexter School.

## DEFENDANTS' BARRIERS IN RESTRAINT OF TRADE
## AGAINST MARKET ENTRY BY THE PLAINTIFF

137.   The music industry, from which most of today's wealth of music arose, formerly included a diversity of music companies, notably

---

[38] Fifth Addendum to Evidence, Article Five

*conglomerated*[39] into the "Big Six" (Warner Music Group, EMI, Sony, BMG, Universal Music Group, Polygram) by the Year 2000.

138.   Since the Year 2012, the former Big Six have been *consolidated* into the "Big Three."

138.   WMG, along with Sony Music Entertainment (~29.5% market share) and Universal Music Group (~38.9% market share), are known as the "Big Three" record labels, due to (*i*) their accepted-in-fact monopoly over the world's *present* music rights catalogue and (*ii*) likely financial dominance over the market potential for *future* consuming audiences and producing artists.

139.   I believe, actions taken in pursuit of the latter (ii) are *per se* unlawful pursuant to Title 15 U.S.C. §§ 1, 2.

137.   Warner Music Group (WMG) had a market share of approximately 18.7% in the Year 2013[40].

138.   Deduced from the premise of the above paragraph, WMG has held a monopoly over part (~18.7%) of commerce.

139.   The advent of digital music distribution wreaked havoc on the music industry, but the "iTunes Music Store" ("iTMS") from Apple Inc., which debuted in 2003, maintained itself as the preeminent digital music retail store, with approximately 63% market share in 2013. The late Steve Jobs of Apple Inc. commented[41], in 2007, on how a mismanagement of new technology may have created financial losses for the Big Three that are of their own doing:

> 140.   ...Universal, Sony BMG, Warner and EMI. These four companies control the distribution of over 70% of the world's music. When Apple approached these companies to license their music to distribute legally over the Internet, they were extremely cautious and required Apple to protect their music from being illegally copied. The solution was to create a DRM system, which envelopes each song purchased from the iTunes store in special and secret software so that it cannot be played on unauthorized devices...DRMs haven't worked, and may never work, to halt music piracy. Though the big four music companies require that all their music sold online be protected with DRMs, these same music companies continue to sell billions of CDs a year which contain completely unprotected music. That's right! No DRM system was ever developed for the CD, so all the music distributed on CDs can be easily

---

[39] Fifth Addendum to Evidence, Article Six

[40] Fifth Addendum to Evidence, Article Seven

[41] Fifth Addendum to Evidence, Article Eight

December 4, 2014

Southgate v. Cohen, WMG, et al.    Amended and Revised Complaint                    Page 26 of 47

uploaded to the Internet, then (illegally) downloaded and played on any computer or player.

141.  As a result of the facts indicated above, I believe in the following conclusion. Music labels had not adequately prepared their business model for new advances in technology—music labels had 'lost grip' and failed to maintain proper *ownership* of their *present/past catalogue* of property because they had not administered the very protection they demanded, from DRM, for digital music (Digital Rights Management software), as for CDs (compact discs), while CDs still represented the majority of music sales. I believe, the defendants of this action, in particular, are capable of being found in restraint of trade as a result of this mismanagement.

142.  I contend that as a result of the mismanagement aforementioned, in the Year 2008, WMG rashly removed[42] its sound recordings from thousands of videos on the Google-owned website "YouTube.com", because of irrational fear and apprehension of new music technology, and WMG caused great disapproval from its consumers. The excuse given by WMG was that "[WMG] simply cannot accept terms that fail to appropriately and fairly compensate recording artists, songwriters, labels and publishers for the value they provide."

143.  I contend that as a result of the mismanagement aforementioned, music labels sought to self-compensate for their losses by raising their income artificially, without increased value to consumers.

144.  By the Year 2010, partial self-compensation by the Big Three, I believe for mismanagement, was achieved, after lobbying, by raising the price per song on iTunes from $0.99 to $1.29.

145.  The 'price-fixing' mentioned in the above paragraph damages me (as Plaintiff), and possibly other producers, (and hence consumers) because it has removed and continued to obstruct the 'price signaling mechanism' that alerts the public (consumers) to consider the quality and demand for the goods (musical sound recordings).

146.  If all songs are exactly and equally priced at $0.99, then the consumer may easily judge the quality and demand for the songs by the success and volume of sales of the songs. If, however, songs are variably priced (as on iTMS), at $0.69, $0.99, $1.29, with labels opting to price most new or popular songs at $1.29 for the sake of self-compensation, the consumer may not easily determine the true market value of a particular song.

147.  *e.g.* As it is easier to judge the respective heights of three individuals standing on level ground, it was easier to judge the popularity of

[42] Fifth Addendum to Evidence, Article Nine

songs based on volume of sales at a single, level price of $0.99; however, as it is more difficult to judge the heights of three individuals standing at different altitudes, just so it is difficult and confusing to judge the popularity of songs at different prices—and music labels fix the price of their goods at the higher price to assert higher quality, to the detriment of other artists who, in order to compete, must have the tendency to lower their own prices and hence imply, although not necessarily true in fact, a lower quality of their competing goods. Such variable pricing allows for an illusion, chiefly to the detriment of the consumer, that a higher price means higher quality.

148.   An experiment[43] by psychologist Solomon Asch also throws into light the tactics employed by the music industry today. Even with a fixed point of reference, the consumer may have difficulty judging without influence; with variable points of reference, good purchasing judgement is more impossible. Without the equitable 'price signaling mechanism' or a healthy 'free market', of a diversity of producers, as a reliable means to discern 'good music' from 'bad music', the public (consumers) may find that is it difficult to justify their displeasure against the quality of the market offerings, and even more difficult to justify such displeasure, in the midst of social pressure, insistence, and influence, from the music labels, asserting all new music is great and worthy of the consumer's dollar.

149.   Alternative quality-and-demand signaling mechanisms are third-party reviews, which are subjective, fickle, and subject to influence of the labels, and trademarks, which consistently denote the quality of a good or service, of a particular origin, for consumers. However, most trademarks in the music industry have been promptly consolidated and monopolized, and this Action addresses the fact that a distinctive competing trademark is too easily infringed and monopolized by the defendants.

150.   As a result of increased prices, WMG experienced decreased sales[44].

151.   I contend that as a result of the mismanagement aforementioned and Greed, WMG and other music labels began instituting "360 Deals"[45], with artists, which entitle the record labels to a share of other 'income streams' such as live music ticket sales, merchandise sales, and endorsement deals.

152.   360 Deals have deterred artists from being freely creative, and by their very definition, they are monopolistic, and I believe, innovation has decreased as a result.

---

[43] Fifth Addendum to Evidence, Article Ten

[44] Fifth Addendum to Evidence, Article Eleven

[45] Fifth Addendum to Evidence, Article Twelve

153.   In the Year 2010, Fast Company magazine ("FCM 2010") reported[46] that Julie Greenwald, COO of Atlantic Records, excused the record labels' requiring of 360 Deals for reason of "costs: songwriters, producers, sound engineers, radio promotions, Internet promotions, people working to place songs in movies and on TV, people to run artists' Web sites." However, as an Artist, I alone have paid these same costs. This report also apparently documented the following interaction: "...Shinedown lead singer Brent Smith walks in, and Greenwald smiles. 'They can't pirate *this*!', she says. 'If they can figure out how to pirate *this*, we're screwed,' says Smith" (italicized emphasis added). Reference to "pirat[ing] *this*," appears to indicate the music labels' fear of losing, due to piracy, *artists themselves*, as as opposed to losing, due to piracy, only *artists' songs*, in the future. Artists, who are natural persons, are the Source from which music and content and income for the labels are derived. Therefore, I believe, the defendants have resorted to coercing artists, in order to retain them.

154.   FCM 2010 also revealed the intentions of Lyor Cohen, WMG, et al.: "[Cohen] shar[ed] part of a confidential report WMG commissioned to estimate what it would've made if its superstars, such as Green Day, had started with *360 deals*. The answer: as much as 160% more revenue for WMG....some current 360 acts are *outperforming* Geen Day and Kid Rock *financially* at the same point in their careers, though they'll never sell as many albums" (italicized emphasis added).

155.   The facts of the above paragraph indicate that intentions of Cohen, WMG, et al., are strictly for a motive of finance and not a motive of "Progress... of useful Arts."

156.   FCM 2010 also revealed the opinion of "Bruce Allen, a longtime talent manager who...says he would never allow a young artist to sign a 360. 'They're dangerous,' he says. [but]...Labels are still the only ones that can build global superstars."

157.   Also in the Year 2010, a WMG artist named "Lupe Fiasco" received particular notoriety[47] because, news sources indicated, his refusal to submit to a 360 Deal caused WMG to resort to coercion, delaying his album's release and withholding promotion.

158.   On September 12, 2013, WMG announced a formal contractual partnership with Clear Channel, which owns and operated over eight hundred and fifty (850) radio stations at the time; now, in the Year 2014, Clear Channel

---

[46] Fifth Addendum to Evidence, Article Twelve

[47] Fifth Addendum to Evidence, Article Thirteen

has been renamed iHeartMedia, and iHeartMedia owns and operates over one thousand and two hundred (1200) radio stations across the country. iHeartMedia appears to be owned by Bain Capital LLC and Thomas H. Lee Partners L.P., who as recently as 2011 had owned WMG.

159.   The WMG SEC form 10-K for the Year 2011 states the following. "Relationships with Former Investor Group: Prior to completion of the Merger, the Company was controlled by an investor group that included, among others, Thomas H. Lee Partners L.P. and its affiliates ("THL"), Bain Capital, LLC and its affiliates ("Bain") and Providence Equity Partners, Inc. and its affiliates ("Providence"). Following are relationships involving the former investor group. Following completion of the Merger, these are no longer related party transactions." I believe, this statement is misrepresentative due to the 'preponderance of the words' "no longer related," because while the statement appears required to deny "related party transactions," it is very clear in stating, affirmatively, indeed, there "are relationships involving the former investor group," and affiliates, and others.

160.   In addition to the facts of the above two paragraphs, Greater Media, which operates twenty two (22) radio stations throughout Boston, Detroit, Philadelphia, Charlotte, and the State of New Jersey, employs several persons who were formerly employed at iHeartMedia (Clear Channel).

161.   In addition to the facts of the above three paragraphs, Greater Media has formed contracts with iHeartMedia, which join Greater Media content with the iHeartMedia digital platform.

162.   As recently as July 31, 2014, seeking to promote my new album titled *SoundSpark*[48], I had visited the Greater Media station building in Boston, attained the phone numbers of the program directors from the receptionist, left a voicemail with three such program directors, followed up via email with at least one program director. My only acknowledgement was, "Thanks Jeremy. Not sure we have a place for it here, but will check out"[49]. Therefore, I believe, I (as Plaintiff) have been damaged by the monopolistic and anti-competitive contracts, actions for exclusive common interest, and Trust, aforementioned.

163.   At least one news source[50], in September 2013, has indicated that the iHeartMedia (Clear Channel) and WMG deal might be bad for the industry and a subtle form of *payola*.

---

[48] Fifth Addendum to Evidence, Article Fourteen

[49] Fifth Addendum to Evidence, Article Fifteen

[50] Fifth Addendum to Evidence, Article Sixteen

164.  I believe, the contracts, among the defendants, found to be in restraint of trade or commerce, are unlawful pursuant to Title 15 U.S.C. §1 *et seq.* and ought to be invalidated.

## FIFTH ADDENDUM TO COMPLAINT

165.  On November 22, 2014, I filed an application for Copyright Registration, with the United States Copyright Office, for the Sound Spark Studios mark, as a work of visual art, authored on November 22, 2011, and first published on May 11, 2012. The Court may, at its discretion, order registration of this mark as a *design* pursuant to Title 17 U.S.C. §1324.

166.  Reasserted and Clarified: In conjunction with other relief, recovery for damages is sought for trademark infringement, pursuant to Title 15 U.S.C. §1117 (b) and (c), actual or statutory, whichever amount is greater, multiplied up to three times, at the discretion of the Court; and these damages may be found as the actual damages of anti-competitive practices recoverable pursuant to Title 15 U.S.C. §15; and thereupon, damages may be threefold again—jointly or severally among the defendants—at the discretion of the Court.

### JOINDER OF DEFENDANTS II

I, Jeremy Southgate, hereby (have) amend(ed) this Complaint as a matter of course or (have) move(ed), if the Court finds it fitting and just, to join the following new defendants to this Action, pursuant to Rule 20 of the Federal Rules of Civil Procedure, on the grounds that, I believe, they have had knowledge of, interests in, and willful agency in, by means of comfort, aid, and collaboration, infringement of United States Trademark No. 4,606,004.

### ADDITIONAL DEFENDANTS II

167.  Adam Pallin is a citizen of New York; Barry Diller is a citizen of New York; Interactiv Corporation is a California corporation; IAC/InterActiveCorp is a Delaware corporation; Kelly Rosenthal is a citizen of California; Kin Collective, Inc., is a California corporation; Kin Collective LLC is a California limited liability company; Milk Studios, LLC is a Delaware limited liability company; Mindspark Interactive Network, Inc., is a Delaware corporation; Plus One Records, LLC, is a New York limited liability company; Quality Control Music LLC is a Georgia limited liability company; Robert Kyncl is a citizen of California; Stanford University is a California school; YouTube, Inc., is a Delaware corporation; YouTube, LLC, is a Delaware limited liability company; Zoe Silverman is a citizen of New York.

168.  Jurisdiction and venue remain proper, in the same manner as cited in paragraph seventy-nine (79).

169.    The combination of defendants jointly has an agent, in Massachusetts, which is SoundSpark Inc..

## 300 ENTERTAINMENT

170.    300 Entertainment has published a gallery of photo pairs[51], which I believe are intended to train consumers to associate 300 Entertainment (its musical sound recordings) with colors that infringe US TM Reg. No. 4,606,004. There are two photos because the left photo is intended to be viewed by the consumer's left eye and the right photo by the consumer's right eye. The pair of photos must be perceived together in order to recognize the recurring appearance of combinations of blue, red, and gold, as a combination of three. I believe, the photos may have been edited specifically to make the infringing colors more prominent.

171.    In the recent Past, 300 Entertainment has announced acquisitions and partnerships from "Quality Control Music" ("Quality Control") and "Milk Studios" ("Milk Studios" a.k.a. Milk Made, Milk Music), and "Plus One Records" ("Plus One"), I believe, in order to acquire their respective distinctive characteristics, such as the colors red, blue, and gold, or the word or imagery "SPARK", that infringe US TM Reg. No. 4,606,004.

172.    300 Entertainment has used an upside-down triangle or the colors blue, red, and gold, in a counterfeiting manner[52], on the artists "ASTR" and "Jacquie Lee" and "Alex Winston", and others, in connection with their respective musical sound recordings. I have become increasingly aware of these elements; they could have been merely decorative *but for* what appears to be the deliberate guiding intent of 300 Entertainment, and associates, to use these elements as counterfeit marks.

173.    Quality Control[53] brings to 300 Entertainment the color gold (used on the artist "Migos") or all the colors blue, red, and gold, while 300 Entertainment often uses the color red, and 300 Entertainment's "TapTape/ SoundSpark/SparkIt" often uses the a blue color tone (teal).

174.    Milk Studios[54] (a.k.a. "Milk Made") brings to 300 Entertainment the alliteration sound of the consonant "M" (similar to the "S" in SOUND SPARK STUDIOS) and use of the colors blue, red, and gold.

---

[51] Sixth Addendum to Evidence, Article One

[52] Sixth Addendum to Evidence, Article Two

[53] Sixth Addendum to Evidence, Article Three

[54] Sixth Addendum to Evidence, Article Four

December 4, 2014

Southgate v. Cohen, WMG, et al.    Amended and Revised Complaint                    Page 32 of 47

175.   Plus One[55] brings to 300 Entertainment concentric ovals in conjunction with a symbol (plus sign).

176.   I believe, as referenced in paragraphs one hundred and seventy-one (171) to one hundred and seventy-five (175), 300 Entertainment may encourage companies, that were once benign and disinclined to infringe my mark, to become (unclean) conspiring active infringers of US TM Reg. No. 4,606,004. I believe, this is anti-competitive behavior.

## WARNER MUSIC GROUP

177.   On July 30, 2014, the former COO of WMG 'jumped ship'[56] to SoundCloud from WMG. He may remain an agent of WMG and may be used to align interests or influence otherwise competitive decisions between SoundCloud and WMG.

178.   On November 4, 2014, WMG announced[57] that it had taken equity (5%) in and formed a license agreement with SoundCloud, an independent online music service with "175 million unique listeners per month." The deal is said to provide "new commercial and promotional opportunities for WMG's roster of established and emerging recording artists." I believe, "opportunities for WMG" are at the expense of free and open commerce and are anti-competitive.

179.   On November 14, 2014, WMG and Stanford University ("Stanford") announced[58] a partnership to seek "cultivate the next generation of leaders in the music world" by giving them the 'opportunity' to intern on an "'in house" assignment with WMG or one of its program partners. WMG seeks "students from across various educational disciplines—music, computer science, product design, economics, and electrical engineering." This "in house assignment" could indicate SoundSpark, Inc. (a.k.a. TapeTape).

180.   In reference to the above paragraph, the 'opportunity' is offered exclusively to Stanford 'Juniors'—students who have completed two years at Stanford—because, with a majority of time completed, such students are likely to graduate. I believe, this is an unlawful allocation of markets pursuant to Title 15 U.S.C. §14, because WMG allocates to Stanford the receipt of tuition (monetary resources from students) before allocating to itself these former

---

[55] Sixth Addendum to Evidence, Article Five

[56] Sixth Addendum to Evidence, Article Six

[57] Sixth Addendum to Evidence, Article Seven

[58] Sixth Addendum to Evidence, Article Eight

students as interns (time and skill which becomes, for WMG, monetary resources from students).

181.    Stanford University also has a program called "SPARK!" which heretofore has been entirely unassociated with music and which is advertised[59] in connection with the music-related 'opportunity' referenced in the above two paragraphs. The Stanford SPARK! program, in medicine, also displays a picture of a neuron, which infringes my use of a neuron and the words "SoundSpark" and a Sound Spark Studios mark on my musical album[60].

GOOGLE

182.    Whereas websites such as YouTube (in ownership relation to Google) and SoundCloud (now relation to WMG) had once upon a time been independent, they had once upon a time used meritocratic algorithms, which caused pages to rise in prominence in the consumer's 'search results' based on direct correlation with page views and consumer ratings. Now, with the interests of Google and WMG in conflict with the interests of the consumer, Google and WMG, and others, may "promote" their own interests (goods and services) to sole prominence in search results, the view of the consumer. Independent producers—who are also consumers—cannot effectively compete because they are not allowed to be in view of the consumer. There appears no longer a truly free and open Public Forum or Marketplace for music and media.

183.    News sources indicate that Robert Kyncl, Google's Vice-President and Head of Business on YouTube, has an "especially close relationship" with Lyor Cohen that and Robert Kyncl was a "key driver" for Google's investing in 300 Entertainment.

184.    As recently as June 17, 2014, news sources[61] reported that "Robert Kyncl confirmed to the Financial Times that YouTube will block videos 'in a matter of days' from labels that have not signed up to its upcoming premium music service." "The [Financial Times] report initially suggested YouTube has signed up labels and distributors representing 90% of the industry, but the FT has since edited that figure to read 95%."

185.    In reference to the previous paragraph, because the Big Three music labels control eighty percent (80%) of music content (reference in paragraph 138), Google and the Big Three are able to misrepresent the diversity of adopters for the new "indefensible" contractual terms of the new music

---

[59] Sixth Addendum to Evidence, Article Nine

[60] Fifth Addendum to Evidence, Article Fourteen

[61] Sixth Addendum to Evidence, Article Ten

service, in order to apply undue social pressure against independent labels to accept said terms.

186.   The new music service was announced, in November 2014, as "YouTube Music Key."

187.   Anticipating that I, as a musician, could no longer rely on YouTube as a means of graining any traction in meaningful commerce, I have relied on my own SOUND SPARK STUDIOS brand and trade skills to develop an independent web presence, to form a competing alternative, for quality original content, in music and entertainment.

188.   As referenced in paragraphs one hundred and eighty-two (182) through one hundred and eighty-seven (187), I believe, I as Plaintiff am damaged by the anti-competitive practices of Google generally—as well as in particular with respect to its involvement in 300 Entertainment's infringing activities.

## SOUNDSPARK/SPARKIT/TAPETAPE

189.   Christopher Nolte and Ana Villanueva ("the MIT Students") have updated a website ("angel.co/soundspark", "SPARKIT Specimen")[62], I believe, to use as a specimen for the USPTO, with new flagrantly infringing use of "SPARKIT" and with the 'opposite' colors of blue, red, and gold: teal (blue/ green), purple, and orange. And one page in particular shows all elements of US TM Reg. No. 4,606,004: the colors blue, red, and gold; an upside-down red triangle behind the gold word mark "ASTR"; the word "SPARK"; and the slant alignment of the letters "S" (indicating SOUNDSPARK). The page states "Member since August 20, 2014".

## ASTR

190.   On November 21, 2014, while writing this addendum, it has first occurred to me that 300 Entertainment has been using its first-signed premier artist "ASTR" as a variant spelling or anagram of "STAR" (or "A STR" like 'a star'). The use of an *artist's name* and *decorative album art* would ordinarily not be where and how the consumer expects to see a trademark for a *record label (music company)*, but considering use of a more evidently infringing upside-down triangle and ASTR (STAR) repetitively in association with 300 Entertainment and now the MIT students' SPARKIT— this, when indicating the similarity of STAR to SPARK, while overlaid on a triangle, as it has been, I have found to be an intentional fraudulent counterfeit use of US TM Reg. No. 4,606,004. I believe, it is further cause for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

---

[62] Sixth Addendum to Evidence, Article Eleven

191.   I believe, use of the ASTR mark[63] ("ASTR Mark") has been deliberately deceptive because of its use as a stylized design in which "A" is larger in proportion to the rest of the mark. One does not simply 'read across' the design for "ASTR"; one must 'read across' the plain word "ASTR" and be thinking of the word "STAR" in order to read into the design "ASTR" and discern what is plainly meant (to infringe) by it.

192.   The ASTR mark has exaggerated "A" and "R" characters, I believe, possibly to infringe the impression of the 'spikes' of an eight-point star in US TM Reg. No. 4,606,004. Elements comprising the letters "A" and "R" may also indicate similarities with marks, from Interactiv, having the serial numbers 86187083 and 86187035, for a green check mark and a stylized word "Activ".

193.   News sources[64] have indicated: "Initially the identities of ASTR were kept secret."

194.   A news source[65] has indicated:
...lounging in the recording studio the band uses as a practice space, Zoe was a bit more shy. "I don't really go out that much," she tells me, laughing. "I've really only been to Westway a few times. I said that because I'm friends with the owner." It's when we start delving into where she goes when she does go out that things get a bit odd. Here are the shows Zoe saw recently: Drake, Lorde, Rhianna. Here is the show Adam brought up: Prince. They have a long discussion about the benefits of being in VIP boxes. In fact, they seem to spend so much time in VIP boxes that when they first start talking about "the box," I'm wasn't sure what they were talking about. To them, it's normal, everyday stuff. What exactly is going on here? How is this brand-new band lounging around Drake's VIP box? In fact, how do they have a gigantic Manhattan recording studio to hang out and listen to records in?
The answer involves some stuff the band would rather not talk about. Zoe the singer and Adam the keyboardist and composer prefer to go by the names Zoe ASTR and Adam ASTR, Ramones-style. At least, that's what Zoe says when I press them for their full names (Adam just sits behind the keyboard, seeming like he might say something, but then thinking better of it). In fact, their names are Zoe Silverman and Adam Pallin. They're both consummate industry insiders, but they come from very different directions....

195.   In reference to the above paragraph, I believe, Lyor Cohen may be 'placing' Adam Pallin and Zoe Silverman in VIP boxes in order to effect that

---

[63] Sixth Addendum to Evidence, Article Twelve

[64] Sixth Addendum to Evidence, Article Thirteen

[65] Sixth Addendum to Evidence, Article Fourteen

"ASTR" achieves 'market penetration' as a counterfeit and that others in the music industry acknowledge and associate ASTR as representing 300 Entertainment.

196.   In reference to the above paragraph, the question, "How is this brand-new band lounging around Drake's VIP box? In fact, how do they have a gigantic Manhattan recording studio to hang out and listen to records in?", is answered by the fact that the father of Zoe Silverman (of ASTR) is Tom Silverman, who had formerly been a Vice President of Warner Bros. Records (a subsidiary of WMG), who founded "Tommy Boy Records," who interviewed and gave publicity to Lyor Cohen, at the Midem music conference in February 2014, where Tom Silverman said, "I've known Lyor for too long to say here."

197.   There appears to be no evidence for the use of the name ASTR as a trademark prior to the group's involvement with 300 Entertainment. Although the two individuals Adam Pallin and Zoe Silverman may have met as early as 2011, and the web domain "astr.tv" was registered by Adam Pallin on November 27, 2011, I believe, Lyor Cohen is the cause of the name ASTR as a mark, and "ASTR" originated from the intent to counterfeit US TM Reg. No. 4,606,004.

198.   In a video interview, published March 2014, Adam Pallin and Zoe Silverman have stated the following, which I believe, confirms the assertion, of the above paragraph, that the band "ASTR" arose subsequent to the meeting of its members (I have transcribed):

Adam: We're a band. We're from New York. Uh, we've known each other for a few years, and uh...
Zoe: (continues) We met through a friend at a yoga studio, a long time ago, and just started writing music together, for no reason, and then, we ended up creating like a 'sound' together, I guess...
Adam: (interrupts) Well, we had a reason; we were trying to write songs! (glances at Zoe)
Zoe: Just to write, but not like to make ASTR, not like specifically (looks at Adam) to do this. So, it just turned into this. We've been writing for a long time—and me too—and we we're both in a million bands forever, so, it worked out.

199.   A news source[66] has indicated, and I believe, it is suspicious:
For us it seemed smart," said [Zoe] Silverman of signing to 300 after her set. "We know what Lyor is capable of, and he has a lot to use. He's going to use us like a weapon.

---

[66] Sixth Addendum to Evidence, Article Fifteen

200.   I believe, in the meaning of Zoe Silverman's saying, "[Lyor's] going to use us like a weapon," is an indication of Lyor Cohen's malice of forethought, for using ASTR, for knowingly counterfeit willful infringement and dilution of a federal trademark, to restrain my participation in commerce, and to create a monopoly, contrary to Federal Law.

KIN COLLECTIVE

201.   Under the belief that "ASTR", as used by 300 Entertainment, must surely have a trademark application, I have discovered, on November 26, 2014, that a search of the Trademark Electronic Search System ("TESS") at the United States Patent and Trademark Office, for the word "ASTR", shows applications by Kin Collective ("Kin")[67], a brand and logo design agency (kincollective.com) that claims "building brands that matter." Therefore, if the intended use for "ASTR" is to cause the consumer to associate "ASTR" with "building brands that matter", I believe, this is fraudulent infringing behavior.

202.   The 'about' page of Kin states that a founding partner of Kin "lives to see projects form from an idea — a spark — and evolve to success." I believe, use of the word "spark" is an attempt to infringe US TM Reg. No. 4,606,004 and associate with 300 Entertainment's (infringing) use of the word; however, said use demonstrates that the word "SPARK" *per se* (as a _single_ word) is generic in reference to creative endeavors. The same 'about' also displays a picture of *three* teal (blue/green) pens that, I believe, further demonstrates association with 300 Entertainment and infringing activities involving the Number 3 and the color teal.

203.   I believe, the word "SPARK", as it is subject of this Action, has uniquely acquired distinctiveness in relation to music and entertainment *solely as a result of inherent distinctiveness of the SOUND SPARK STUDIOS mark* because SPARK is the *most distinctive* of three words that have never before been perceived together as a design or mark of commerce. (And SPARKIT, in addition to being claimed with priority by me, is derived and acquires distinctiveness from SOUND SPARK STUDIOS).

204.   I believe, 300 Entertainment are using "Kin" to infringe and dilute the letter "K" in "SPARK". Kin had also filed an application, having the serial number 86162013, for "KAYDEN", I believe, as an attempt to trademark the "KAY" as enunciation of the letter "K", but this application was abandoned.

205.   The trademarks by Kin Collective are namely for goods in Class 25, namely women's clothing. I believe, this links said Kin applications to trademark applications, for the word mark ("300 Entertainment") and design mark ("Triangle Mark") of 300 Entertainment, for clothing under Class 25. It

---

[67] Sixth Addendum to Evidence, Article Sixteen

also links the consumer's association of "women's clothing" with the band ASTR's front-woman Zoe Silverman, Kelly Rosenthal of I AM STRIKES, and others, who may wear the articles (clothes) mentioned.

206.  The application for the design mark "ASTR BY KIN", having the serial number 86057297, is substantially indistinguishable from the mark used by the band "ASTR."

207.  I believe, the application for the word mark "ASTR THE LABEL", having the serial number 86388866, is deceptive because it would appear to designate a clothing 'fashion label' but seems to be actually intended, in light of Evidence, to designate ASTR THE [MUSIC] LABEL.

208.  The only mark by Kin for which infringement may not have been originally intended is that of the words "STITCH X STITCH". However, I believe, 300 Entertainment may have intended to acquire this use, in the manner as referenced in paragraph one hundred and seventy-six (176), from the individuals of Kin, as a means of diluting and blurring the alliteration of the letter "S" from "SOUND SPARK STUDIOS."

209.  I believe, marks applied for by Kin Collective (LLC and Inc.), having the serial numbers 85711235, 85526610, 86057291, 86057297, 86388866, (and abandoned as DEAD: 86162010, 86162013, 86165613), are further causes for action against the defendants, pursuant to Title 15 U.S.C. §1114, Title 15 U.S.C. §1125, and Title 18 U.S.C. §1001.

## INTERACTIV CORPORATION

210.  Given the development of paragraph one hundred and eighty-nine (189) and upon closer examination of trademark applications pending before the United States Patent and Trademark Office ("USPTO"), an application[68] ("Interactiv Application") by Interactiv Corporation ("Interactiv"), for the mark "SPARK" for *Marketing services in the nature of developing an online business marketing campaign for entrepreneurs to receive monetary pledges and to distribute an incentive reward program on a global computer network,*" came to my attention. I believe, there is some connection between Interactiv and 300 Entertainment. The claimed date of first use for this "SPARK" application is June 5, 2014, which is the same day as the creation of the webpage[69] at the domain "angel.co/soundspark".

211.  Continuing from the above paragraph, the Interactiv Application bears uncanny resemblance to the application for "SPARKIT", for

---

[68] Sixth Addendum to Evidence, Article Seventeen

[69] Sixth Addendum to Evidence, Article Eleven

*"Crowdfunding services in the nature of accepting and administering monetary contributions from a group of individuals; Crowdfunding services in the nature of providing financing from money collected from individuals,"* by SoundSpark Inc. (and Ana Villanueva and Christopher Nolte).

212.   As referenced above, the Interactiv Application uses language in its claims for goods and services which seems intended to deceive by being different from the SPARKIT Application with respect to its representation ("receive monetary pledges" *versus* "crowdfunding services") but the same or broader in its intended effect. In addition, the Interactiv Application makes no overt mention of music or entertainment, although it seems intended for music and entertainment. I believe, this may be misrepresentation, and this may be further cause for action pursuant to Title 15 U.S.C. §1114, Title 15 U.S.C. §1125 and Title 18 U.S.C. 1001.

213.   Inspection of the specimen[70] submitted to the USPTO shows similarity of color, to the colors of the new updated website, from the MIT Students, by the use of teal (blue/green), orange, and purple; the word "SPARK" is overlaid on teal in direct similarity to the design mark consisting of two "S" letters used by Christopher Nolte, Ana Villanueva, and SoundSpark Inc.. The specimen also includes an image of a music hall and musical instruments. The specimens by Interactiv are very generic and blurry, appearing inauthentic, making it difficult or impossible to distinguish where in commerce the mark is actually used in the manner depicted.

214.   Other trademark applications by Interactiv Corporation are similarly suspicious[71].

215.   An Interactive service mark application for the word "EMERGENCY"[72], for the services of *"Operating on-line marketplaces featuring geolocation based services and/or goods for sellers and buyers, members may comment, rate, and review on services and/or goods, and members may follow other members via computer, mobile, wireless, internet, and other communications networks,"* may cause a likelihood of confusion with "SOUND SPARK", because it may be claimed that a consumer associates the siren (SOUND) and flashing light (SPARK) of an EMERGENCY (e.g. an ambulance, fire alarm system) with SOUNDSPARK. The claimed date of first use for this mark is August 20, 2014, which is the same day as the SPARKIT Specimen[73] indicates.

---

[70] Sixth Addendum to Evidence, Article Eighteen

[71] Sixth Addendum to Evidence, Article Nineteen

[72] Sixth Addendum to Evidence, Article Twenty

[73] Sixth Addendum to Evidence, Article Eleven

216.    It is possible that EMERGENCY was filed alongside an application for HEALTH in order to appear less suspicious or to associate with Edgar Bronfman, Jr.'s directorship at "Accretive Health" or for another purpose unknown.

217.    I have a service mark application pending for "SOUND STREAM" (Serial Number 86375502), where "SOUND" is disclaimed from exclusive right. However, I believe, I may protect this mark's alliteration of the letter "S" with US TM Reg. No. 4,606,004.

218.    Against my application for "SOUND STREAM", I suspect "BEAM"[74] may have been filed because it rhymes with "stream" and "BRIDGE"[75] may have been filed because it is associated with rivers or "streams"; and another mark for "STREAMZ"[76] appears already to have been obtained with a suspicious claim of individual letters "S","T","R","E","A","M","Z" in order to trademark the generic word "stream", denoting a transfer of digital information, for the services of "*Computer services, namely, creating an on-line community for registered users to engage in social networking featuring user-generated content for free or membership fee, to post, to pin, to create, to share, to rate, and to participate in discussions on user-generated pages, blogs, pinboards, photos, forums, videos, music, events, apps, and marketplace classified ads, to follow or be followed, and to engage in internet messages on a global computer network.*"

219.    A specimen for the "STREAMZ" mark shows ones and zeros (1s and 0s) that indicate digital information (binary) in connection with two clearly present logos: the "GOOGLE" mark and the "VEVO" mark. "VEVO" is owned and operated by Google and by Sony Music Entertainment and Universal Music Group (two of the Big Three record labels). I believe, this may indicate allowance and connection with Google and Vevo by Interactiv.

220.    I also claim common law trademark rights to "Spark Music Discovery," against which there appears to be a "DISCOVER" mark filed by Interactiv.

221.    I believe, it may be fitting for the Court to exercise its discretion over the USPTO, to prevent or cancel registration of the marks BEAM, BRIDGE, DISCOVER, EMERGENCY, HEALTH, SHARE, SPARK, and STREAMZ, on the grounds that they are generic words, claimed for broad and generic use, their specimens are indistinctive and possibly inauthentic, and justice so requires.

---

[74] Sixth Addendum to Evidence, Article Twenty-One

[75] Sixth Addendum to Evidence, Article Twenty-One

[76] Sixth Addendum to Evidence, Article Twenty-One

Furthermore, they dilute US TM Reg. No. 4,606,004, pursuant to Title 15 U.S.C. §1125. Any registrations that have issued may be cancelled pursuant to Title 15 U.S.C. §1064.

222.   The CEO of Interactiv Corporation, in San Jose, California, is a James Chu, whose identity I have found to be inaccessible.

## IAC/INTERACTIVECORP

223.   On November 28, 2014, my search of other possible links to "Interactiv Corporation" has brought to my attention IAC/InterActiveCorp ("IAC"), a Delaware corporation, with a principal place of business in New York. IAC is an internet brand company.

224.   Edgar Bronfman Jr., in addition to being a director of WMG (he has previously been CEO and Chairman of WMG but now remains as a director), in addition to having been a Vice Chairman of Vivendi Universal (parent of Universal Music Group, one of the Big Three record companies), is[77] also a director of IAC/InterActiveCorp.

225.   A news source[78] indicates that Edgar Bronfman, Jr., is a close friend of Barry Diller, who is the CEO of IAC/InterActivCorp.

226.   Deduced from the previous two paragraphs and apart from the allegations that now follow, I believe, IAC/InterActivCorp and any of its many subsidiaries have colluded to infringe US TM Reg. No. 4,606,004 and monopolize, in restraint of commerce, the music, media, and entertainment industry.

227.   IAC/InterActiveCorp trademarks[79] had, at one time, fourteen (14) trademark registrations for a design mark consisting of the words "IAC/ InterActivCorp", where the slash ("/") is stylized as a triangle. All but one of these registrations are now abandoned; the registration that remains is for "Apparel, namely, jackets, sweatshirts and vests." (Class 25).

228.   The slash ("/") triangle belonging to IAC, such as on Registration No. 3660365, is a colorable imitation a checkmark, Registration No. 4605045, belonging to Interactiv Corporation, and that checkmark is of the color green, for which IAC has claimed rights via, for instance, USPTO application with serial number 78683889, for "GREEN.COM". Given that IAC is likely to protect

---

[77] Sixth Addendum to Evidence, Article Twenty-Two

[78] Sixth Addendum to Evidence, Article Twenty-Three

[79] Sixth Addendum to Evidence, Article Twenty-Four

its own trademark rights, I believe, there is strong likelihood of allowance and association between Interactiv (California) and IAC (New York, Delaware).

229.    IAC owns a subsidiary by the name of Mindspark Interactive Network ("Mindspark"), which at present, on its website (mindspark.com), claims to "conceptualize, develop and strategically market unique digital applications for online audiences across a diverse range of interests" and includes a mark consisting of red, gold, and blue triangles and the word(s) "MINDSPARK" and a theme of triangles as a background.

230.    In reference to the above paragraph, an internet archive service indicates[80] the Mindspark website was changed between November and December 2013. Prior to this change, the website had no similarity to US TM Reg. No. 4,606,004. Prior to the change, the website had stated, "Mindspark is home to some of the most popular digital snacks on the web. Our homemade apps provide a break from reality, a quick pick-me-up, or a from of self expression. Because let's face it...snacks make people happy," and displayed an image of a vending machine.

231.    I believe, IAC and Mindspark have infringed the distinctive and exclusive rights of US TM Reg. No. 4,606,004, *per se,* for *"Digital music downloadable from the Internet; Downloadable music files; Downloadable musical sound recordings;",* because IAC's Mindspark offers for sale "unique digital applications for online audiences" and "music files" are a type of "unique application." On this basis, I believe, there is a cause of action against IAC/InterActivCorp and Mindspark pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

SPARK MUSIC MANAGEMENT

232.    Because this action arises out of concern for the protection of US TM Reg. No. 4,606,004, and Declaratory Judgement is sought in favor of the same, as inherently famous and distinctive mark, I believe the Court may exercise its discretion over the USPTO to cancel the registration of the words "SPARK MUSIC MANAGEMENT", filed on December 12, 2013, registered to Oliver Hammett of the State of New York, for *"Branding services, namely, consulting, development, management and marketing of brands for businesses and/or individuals; Business management consulting; Consulting services in the field of managing intellectual properties; Management of performing and recording artists; Talent management services for individuals and business in the fields of entertainment, e-commerce, and lifestyle branding , namely, talent management services for actors, models, musicians, entertainers, music producers, brand assets, social media professionals, and entrepreneurs."*

---

[80] Sixth Addendum to Evidence, Article Twenty-Five

December 4, 2014

Southgate v. Cohen, WMG, et al.    Amended and Revised Complaint                    Page 43 of 47

233. I believe, US TM Reg. No. 4,606,004, filed June 28, 2012, has priority over "SPARK MUSIC MANAGEMENT" and there is a likelihood of confusion and dilution of US TM Reg. No. 4,606,004, for musical sound recordings and digital downloads posed by "SPARK MUSIC MANAGEMENT". Moreover, the mark "SPARK MUSIC MANAGEMENT" disclaims "MUSIC MANAGEMENT", and it is therefore allowed registration based on the distinctiveness of of the word "SPARK", which *per se* is a generic word meaning "inspiration" and strongly alludes to "STAR", which is a generic word meaning "famous person", in the music and entertainment industry.

234. This action was filed on October 6, 2014, and therefore, this action has timely occurred before the end of opposition, at the USPTO, for the marks contested.

## I AM STRIKES

235. In the Year 2011, I had become aware of a musician by the name of Kelly Rosenthal, who is a citizen of Sacramento, California, because she had published many (virtuosic) musical performances to YouTube and gained some notoriety, a "following" of one million users, who had "subscribed" to her YouTube webpage "channel," for her music.

236. Because of her YouTube success, she had obtained the attention and management of "Paradigm Agency" and "Career Artist Management," in the latter of which Pete Giberga (as in Paragraph 22) has been an associate.

237. By 2011, Kelly Rosenthal had formed a band called Say Chance ("Say Chance") and traveled across the country to reside, in Maryland, with two other girls with whom she formed the band.

238. Due to the influence and power of Pete Giberga's management, for 'placement' of Say Chance, I had the coincidental opportunity to see Say Chance perform, at the "9:30 Club" in Washington, D.C., on February 4, 2012, immediately prior to a concert by the band "Augustana" (who have a song titled "Boston"), as I was visiting my cousin, who resides there.

239. The 9:30 Club has a capacity of one thousand two hundred (1200) people and appeared full; therefore, I was witness to an enviable opportunity, for "exposure," for Say Chance, in marketing their original music. At that time, Say Chance were selling CDs with three debut original songs. Say Chance received other such 'placements' for exposure at many other performances over its course of development.

240. At the 9:30 Club, I also had the opportunity to meet and make myself known to the band members, and since then, in view of the willingness to collaborate that brought Say Chance together, I have periodically reached

out[81] to Say Chance with a desire to collaborate with music likewise. I received no acknowledgement or reply.

241.  In January 2013, it was announced, abruptly, that Say Chance had disbanded—I believe, it happened suspiciously, in the same month in which "Theory Entertainment LLC" was established and the 300 Entertainment venture began in earnest. I believe, the break-up of Say Chance is extremely unfortunate and may demonstrate the callousness and lack of support from the music industry with respect to talent-seeking and adding any valuable consideration to that talent.

242.  In January 2014, it was reported that Pete Giberga had joined 300 as head of A&R (artist development).

243.  On February 19, 2014, after a period without any news, Kelly Rosenthal announced a new musical project by the name of "I AM STRIKES", with a website and other social media pages launched therewith. I AM STRIKES began with a black-and-white theme and played on the theme of "striking" or 'deleting' or 'canceling' one identity in favor of another.

244.  On November 28, 2014, a certain conclusion ripened and came to my full attention: Because it is linked to 300 Entertainment by the agency of Pete Giberga, I believe, I AM STRIKES is further knowingly counterfeit willful infringement of US TM Reg. No. 4,606,004.

245.  I AM STRIKES is connected with a design mark ("I Am Strikes Logo") consisting of two sets of three diagonal crossing bars with the colors green, red, gold, and white, and the words 'I AM STRIKES', and a narrow horizontal red line under the characters "STR."

246.  The I Am Strikes Logo contains the characters "A STR", like "ASTR," which alludes to STAR, which infringes SPARK. "STR" in particular is underlined and emphasized, in the I Am Strikes Logo, by means of a red line similar to the red lines of a triangle used with the ASTR Mark (referenced in Paragraph 191).

247.  In addition, the I Am Strikes Logo infringes the general triangular impression or 'center of mass' and the colors red and gold of US TM Reg. No. 4,606,004. I AM STRIKES social media pages have gradually increased my awareness that the color blue has been recurring—and made more noticeable in contrast to the colorless black-and-white images—in a manner correlating with color-branding tactics employed by 300 Entertainment—because Kelly Rosenthal often performs wearing some blue clothing 'top', 'shirt','or hoodie', which links to the Kin trademark applications for women's clothing (Class 25).

---

[81] Evidence, Exhibit G

248. In addition, I AM STRIKES uses a teal (blue/green) suitcase as a 'trademark prop', with the words "I AM STRIKES" displayed as black letters with the exception of the first "S" in "STRIKES" which is stenciled so that the teal (blue-tone) of the suitcase comprises the letter "S", and this infringes the blue text of the words "SOUND SPARK STUDIOS" of US TM Reg. No. 4,606,004.

249. I believe, the I Am Strikes Logo is essentially the same as the logos (marks) used by 300 Entertainment and ASTR. They copy exactly, each and every opposite characteristic of US TM Reg. No. 4,606,004.

250. On November 25, 2014, the Facebook webpage for I AM STRIKES published an minimalistic image that is also strongly similar to an image used by 300 Entertainment. And this image credited "Star Splitter Media," as the origin of media goods (where "media" may connote music) in connection with other marks of the webpage.

251. In reference to Paragraphs two hundred and forty-three (243) through two hundred and fifty (250), I believe, there is further cause[82] for action pursuant to Title 15 U.S.C. §1114 and Title 15 U.S.C. §1125.

## CONCERNING MONOPOLY

252. Even media-conglomerate executives such as Ted Turner and Barry Diller have commented[83] with respect to the detrimental effects of media and entertainment monopoly.

253. The intent of the Sherman Anti-Trust Act was described thus[84]:
The popular mind is agitated with problems that may disturb social order, and among them all none is more threatening than ... the concentration of capital into vast combinations. ... Congress alone can deal with them and if we are unwilling or unable there will soon be a trust for every product and a master to fix the price for every necessity of life.

## CONCLUSION II

254. Reaffirmed: I believe, the SOUND SPARK STUDIOS design and mark is a non-generic, uniquely distinctive, *novel* use of several words that indicate a particular origin and standard, of quality, of goods and services bearing the likeness, under my ownership. As it is a *completely novel work of*

[82] Sixth Addendum to Evidence, Article Twenty-Six

[83] Sixth Addendum to Evidence, Article Twenty-Seven

[84] http://iipdigital.usembassy.gov/st/english/publication/ 2008/04/20080423212813eaifas0.42149.html#axzz3JX0JDBbc

*authorship,* I believe, it deserves all of the protections of intellectual property afforded by the United States of America.

## PRAYER FOR REMEDY

I, as a *pro se* litigant, faithfully presenting before the Court, respectfully request that the Court, in determining what remedies are fitting and just to provide, consider, interpret, and apply all of Title 15 U.S.C. §1 et seq. and Title 15 U.S.C. §1051 et seq. to this action.

I respectfully request that the Court order injunctions, the surrender of all infringing articles, maximum statutory damages, and any other remedies that the Court may deem fitting and just to provide.

I respectfully request that the Court consider and apply the principles of equity, common law, and contracts to this action and grant any remedies that can be discerned therefrom as the Court may deem fitting and just to provide.

I respectfully request that the Court grant an extension of time, for me, to investigate further claims and, if good cause is found, timely file further actions against the defendants, or their associates, connected to this action.

I respectfully request the Court's Summary Judgment on this action.

I respectfully request that the Court issue a Declaratory Judgement affirming my ownership of United States Trademark No. 4,606,004, the **SOUND SPARK STUDIOS** mark, for all its evident applications in media and entertainment.

In God, I trust

On this day,                                    With Great Respect,

December 4, 2014

**Jeremy Christopher Southgate**
10 Kilburn Rd.
West Newton, MA 02465
jeremy@soundsparkstudios.com
617-584-5219